UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| TRAVIS WILLIAM ELLIS, an individual, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>TYSON FOODS, INC. )<br>)<br>Defendant. )<br>_____ ) | Case No. _____<br><br>**COMPLAINT**<br><br>[JURY TRIAL DEMANDED] |

## INTRODUCTION

1. Plaintiff Travis William Ellis seeks relief from Defendant Tyson Foods, Inc.'s ("Tyson" or "Defendant")'s pattern of discriminatory, unconstitutional, and illegal behavior against employees who request religious exemptions from Tyson's COVID-19 vaccination mandate policy.

2. On August 3, 2021, Defendant imposed a draconian vaccine mandate for all employees. Defendant's mandate addresses a very remote risk, asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

3. Defendant responded to their employees seeking religious, disability and medical exemptions by informing those employees that they would be effectively terminated on November 1, 2021, (October 1, 2021 for corporate team members such as Mr. Ellis), and placed on an unpaid, unprotected, and unprecedented leave of absence with no assurance that they would be allowed to return to the workplace for up to one year (hereinafter Tyson's "Vaccine Mandate").

4. Defendant's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental and harmful mRNA COVID-19 vaccine, at the expense of his religious beliefs, bodily autonomy, medical privacy, and health – or losing his livelihood.

5. This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Arkansas civil rights law.

6. Defendant's actions violated federal and Arkansas law by mandating an experimental medical treatment, retaliating against employees who engaged in protected activity, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7. Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Arkansas against precisely such Catch-22 "choices."

**PARTIES**

8. Plaintiff Travis Ellis ("Plaintiff" or "Ellis") was employed as a food scientist at Tyson Foods' Corporate Research and Development office in Springdale, Arkansas. In 2021, Mr. Ellis requested an exemption from the Vaccine Mandate on religious grounds. Tyson denied his exemption request. Instead, Tyson placed Mr. Ellis on an unelected, unpaid, and unprotected leave of absence. Mr. Ellis is a citizen of Arkansas.

9. Defendant Tyson Foods, Inc. ("Tyson"), together with its subsidiaries, is a corporation that operates as a worldwide food processing and marketing company.

10. Tyson is the world's largest processor and marketer of chicken, beef, and pork.

11. At all relevant times, Tyson knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. §§ 2000e et seq.

13. This Court has supplemental jurisdiction over the state claims raised in this action pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendant Tyson, because it transacts business in Arkansas, and the wrongful conduct and resulting injuries alleged herein substantially occurred in this state.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the cause of action arises primarily from a Tyson research and development facility in Springdale, situated in Washington County.

16. An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**Coronavirus and Tyson's Response**

17. In the spring of 2020, Tyson began implementing mitigation procedures for its workforce, including several of the following requirements for its employees: masks, face

shields, social distancing, temperature checks, COVID-19 testing,[1] and self-quarantines.[2] Tyson initially made several accommodations for hourly employees.[3] For example, in March of 2020, the company relaxed attendance policies in its plants by "[]eliminating any punitive effect for missing work due to illness."[4]

18.    Tyson experienced substantial success reducing the risk of COVID-19 spread through self-quarantining for the symptomatic and testing for the asymptomatic persons. As even Anthony Fauci admitted, the risk of asymptomatic spread is very rare and very low, with experts estimating it is largely a non-existent risk. At worst, asymptomatic risk of employees spreading lethal COVID-19 is less than one-in-a-million. Even in that one-in-a-million risk, testing easily addresses asymptomatic risk without requiring bodily invasion against a person's will of an experimental drug with unknown long-term side effects due to its novel mRNA methodology, with the worst short-term adverse events reported in the government's VAERS database in American history, and whose administration offends the conscience of millions of Americans' deeply held spiritual

---

[1] Tyson Foods, *Tyson Foods CEO Provides Update on Efforts to Address COVID-19* (April 6, 2021), *available at* https://www.tysonfoods.com/news/news-releases/2020/4/tyson-foods-ceo-provides-update-efforts-address-covid-19 (last visited Sept. 27, 2021); Tyson Foods, *Why Tyson Has Taken a Leading Position on COVID-19 Testing* (July 1, 2021), *available at* https://thefeed.blog/2020/07/01/covid-19-testing-at-tyson-foods/ (Last visited Sept. 27, 2021).

[2] Tyson Foods, *Protecting Team Members and Our Company; Ensuring Business Continuity* (March 17, 2020), *available at* https://www.tysonfoods.com/news/news-releases/2020/3/protecting-team-members-and-our-company-ensuring-business-continuity (last visited Sept. 27, 2021); Chattin Cato, Tyson Team Innovates to Make Face Shields for Frontline Workers (July 6, 2021) available at https://thefeed.blog/2020/07/06/tyson-innovates-to-make-face-shields-for-frontline-workers/ (last visited Sept. 27, 2021).

[3] Ibid.

[4] Ibid.

  beliefs and religious faith due to the use of aborted fetal cells in its testing, development and production of each of these experimental vaccines.

19.  The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020. One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine. Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.

20.  Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines available for use in the United States at the time in question are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses. Pfizer's FDA-approved Comirnaty vaccine had not yet been administered to the public.

**Tyson's Unlawful Vaccine Mandate**

21.  We face an unparalleled moment in history, when employers have begun mandating an experimental vaccine that utilizes novel technology and, not only has conferred little to no benefit to recipients, but has injured tens of thousands of individuals who elected or were forced to receive the vaccine by virtue of vaccination mandates exactly like Tyson's.

22.  On approximately August 3, 2021, Tyson publicly announced it would require all "[]team members at U.S. office locations to be fully vaccinated by October 1, 2021."[5]

---

[5] Tyson Foods, *Tyson Foods to Require COVID-19 Vaccination for its U.S. Workforce* (Aug. 3, 2021) *available at* https://www.tysonfoods.com/news/news-releases/2021/8/tyson-foods-require-covid-19-vaccinations-its-us-workforce (last visited Sept. 27, 2021).

Tyson also announced that all other team members would be required to be vaccinated by November 1, 2021.

23. In announcing the mandate, Tyson CEO Donnie King justified the decision by claiming, "the U.S. Centers for Disease Control and Prevention is reporting *nearly all hospitalizations and deaths* in the U.S. are among those who are unvaccinated" (emphasis added).[6] As set forth herein below, Mr. King's statement was false.

24. Tyson publicly stated that "[e]xceptions to the vaccination mandate will involve workers who seek medical or religious accommodation."

25. However, for those employees who made objections to Tyson's Vaccine Mandate upon religious or medical exemptions grounds, Tyson placed them on an unelected, unpaid, and unprotected leave of absence that Tyson called *Leave of Absence Plus* (hereinafter "LOA+"). Under this policy, employees were not officially terminated, but were effectively terminated because they were denied access to work and received no compensation or benefits.

26. Employees placed on LOA+ were given one year during which time if they got vaccinated, they could potentially return to work but their original position was not guaranteed. At the end of the year, if they remained unvaccinated, they were terminated.

**Tyson's Vaccine Mandate Will Not Stop the Spread of COVID-19**

27. The real-world experience of mRNA vaccines continues to undermine claims of efficacy. The efficacy of all three available vaccines has been drastically waning and is a far cry from what was originally promised.

---

[6] Donnie King, *Our Next Step in the Fight Against the Pandemic* (Aug. 3, 2021), *available at* https://web.archive.org/web/20210803143911/https://thefeed.blog/2021/08/03/our-next-step-in-the-fight-against-the-pandemic/ (last visited Sept. 27, 2021).

28. More than a year after the COVID-19 biologics have been introduced to the American public *en masse,* the reports of adverse events and death from the injections are staggering and far exceed that which has been seen from any vaccine in human history.

29. Data released on May 20, 2022, by the Centers for Disease Control and Prevention (CDC) showed that since December 14, 2020, a total of 1,322,709 adverse events following vaccination were reported to the Vaccine Adverse Event Reporting System (VAERS), with 30,942 deaths reported.[7]

30. This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[8] The CDC has failed to account for this underreporting.

31. The input of event reports to VAERS since the COVID vaccines were rolled out is ***greater than all cumulative adverse event reports to VAERS for the prior 30 years***: an alarming statistic.

32. There have been a myriad of short-term vaccine side effects that have been witnessed and reported since the rollout of the vaccines, including myocarditis, pericarditis, Guillain-Barre syndrome, blood clots, reproductive health issues, and more.

33. We now know that vaccine-induced spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the

---

[7] CDC Wonder, Vaccine Adverse Event Reporting System (VAERS), *available at* https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=DA4BD564C41F4D061172AC48FE4C.

[8] Frederick Varrichio et al., Understanding Vaccine Safety Information From the Vaccine Adverse Event Reporting System. 23 Pediatr Infect Dis J. 287 (2024), *available at* doi: 10.1097/00006454-200404000-00002. PMID: 15071280.

circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood-brain barrier. Spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[9] Since there exists no way to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person.

34. Furthermore, strong but not yet conclusive evidence links spike protein in vivo to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes, the very severe effects of COVID-19 disease itself. The damage the spike protein may be causing must be fully elucidated. The toxicity of the spike protein means that no vaccine using this design can be assumed to be safe until proven otherwise.

35. Studies have also shown that antibody-dependent enhancement ("ADE") poses a severe threat to vaccinated individuals.[10] "ADE occurs when the antibodies generated during an immune response recognize and bind to a pathogen, but they are unable to provide infection. Instead, these antibodies act as a 'Trojan horse,' allowing the pathogen to get into cells and exacerbate the immune response."[11] Thus, when dealing with different strains of COVID-19, ADE caused by the COVID-19 biologic may accelerate the virus infecting the cells and resulting in more severe illness.

---

[9] SARS-CoV-2 mRNA Vaccine Biodistribution Study, *available at* https://www.docdroid.net/xq0Z8B0/pfizer-report-japanese-government-pdf.

[10] Nouara Yahi et al., *Infection-enhancing anti-SARS-CoV-2 antibodies recognize both the original Wuhan/D614G strain and Delta variants. A potential risk for mass vaccination?* 83 Journal of Infection, 607, *available at* https://doi.org/10.1016/j.jinf.2021.08.010.

[11] Children's Hospital of Philadelphia, Antibody-dependent Enhancement and Vaccines, *available at* https://www.chop.edu/centers-programs/vaccine-education-center/vaccine-safety/antibody-dependent-enhancement-and-vaccines.

**Tyson's Discriminatory Treatment of Mr. Ellis**

36. Mr. Ellis was employed as a food scientist at Tyson's research and development facility in Springdale, Arkansas since 1995.

37. Upon Tyson's implementation of the Vaccine Mandate, Mr. Ellis was subject to the October 1, 2021, deadline to be fully vaccinated.

38. Mr. Ellis filed a form with the Human Resources department of Tyson, requesting an exemption from Tyson's COVID-19 vaccine mandate on the grounds that the mandate conflicted with his religious beliefs.

39. Tyson denied Mr. Ellis's request for an exemption from its Vaccine Mandate. Instead, the only option to immediate termination given by Tyson was for Mr. Ellis to go on the unpaid, unelected, and unprotected leave of absence (i.e. LOA+).

40. On October 1, 2021, Tyson placed Mr. Ellis on unpaid leave through LOA+ for up to one year, after which, he would be permanently terminated. Further, if Mr. Ellis remained unvaccinated after October 1, 2021, Tyson informed him that his job was not protected and Tyson would actively seek to fill his position in the interim. In this way, Tyson maintained constant pressure upon Mr. Ellis to surrender his religious objections to vaccination even after it forced him on unpaid leave through LOAd on October 1, 2021.

41. Tyson made allowances for other employees who refused to comply with the vaccination requirement.

42. Mr. Ellis filed an employment discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") and was granted a Right to Sue Letter on July 15, 2024. This suit has followed.

**COVID Vaccines Violate Mr. Ellis's Religious Beliefs**

43. Mr. Ellis holds sincere concerns surrounding the process used to create COVID-19 vaccines. As a follower of Christ, Mr. Ellis believes life is sacred (especially life within the womb), and therefore has strong objections to the use of aborted fetal cells being used in medical treatments of any kind. As the COVID-19 vaccines at the time were manufactured with aborted fetal cells, Mr. Ellis could not in good conscience take one.

44. Additionally, believing that man is created by God, in His image, for His purpose, as we are, Mr. Ellis could not allow his DNA to be changed as a result of taking any of the COVID-19 vaccines.

45. At the time the dispute between Mr. Ellis and Tyson commenced, all COVID-19 vaccines made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[12]



46. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[13]

---

[12] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[13] Institute for Clinical Systems Improvement, *Are the Vaccines Made with Fetal Cells*, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021); *see also,* Tennessee Department of Health, *Fact v. Fiction: Johnson & Johnson Vaccine* (2021), *available at*

47. In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[14]

48. As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[15] All HEK 293 cells are descended from tissue taken in 1973 from either an elective abortion or miscarriage[16] that took place in the Netherlands.[17]

49. While the production of the vaccines did not reportedly require any new abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-gotten gains.

---

https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[14] WREG-TV, *State: Fetal cell lines, Not Fetal Tissue, Were Used to Make Johnson & Johnson Vaccine* (March 5, 2021), *available at* https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[15] *See*, Nebraska Medicine, *You Asked, We Answered: Do the COVID-19 Vaccines Contain Aborted Fetal Cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[16] *COVID-19 Vaccine and Fetal Cell Lines*, *supra* note 12.

[17] Ibid.

50. Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the unjust exploitation of unborn human life. On this basis, Plaintiff refused on religious grounds to accept or be forced to accept the COVID-19 vaccines.

## FIRST CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq. ("Title VII")]**

51. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

52. Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation against an employee for engaging in protected activity. *Walborn v. Erie Cnty Care Facility*, 150 F.3d 584, 588 (6th Cir. 1998.).

53. Title VII imposes upon an employer the duty to make reasonable accommodations for religious observances short of incurring an undue hardship. *Reed v. UAW*, 569 F.3d 576, 579 (6th Cir. 2009) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S. Ct. 2264, 53 L. Ed. 2d 113 (1977)).

54. Plaintiff requested a religious exemption from Tyson's COVID-19 Vaccine Mandate.

55. Defendant denied Plaintiff's religious exemption. Instead, the only option offered to Plaintiff by Defendant to avoid immediate termination for his religious objection, was one year of unpaid leave pursuant to its LOA+ program. This program was akin to termination, with a promise of termination if the employee did not receive a COVID-19

vaccine at the end of that year, and further that Tyson would actively seek to fill Plaintiff's position in the interim.

56. Defendant failed to provide Plaintiff with a reasonable accommodation for his religious observances as is required under Title VII. One year of unpaid leave is not a reasonable accommodation, but rather a punitive measure taken against employees who choose to exercise their religious rights. This is particularly so because under Tyson's LOA+ program, Tyson in its discretion would actively seek to fill Mr. Ellis's position while he was on unpaid leave.

57. By denying reasonable accommodation and executing punitive measures against employees who refrain from obtaining a COVID-19 vaccine on religious grounds, Defendant discriminated against Plaintiff due to his religious beliefs.

58. Defendant's failure to provide a religious accommodation has injured and will continue to injure Plaintiff by discriminatorily denying his employment and income.

59. As such, Defendants have violated Plaintiff's rights under Title VII by discriminating against him on the basis of religion and failing to provide a reasonable accommodation for his religious beliefs.

## SECOND CAUSE OF ACTION
### Religious Discrimination
### [Violation of the Arkansas Civil Rights Act of 1993]

60. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61. Section 16-123-107(a) of the Arkansas Civil Rights Act of 1993 states that citizens of Arkansas have the right to "be free from discrimination because of race, religion, national

13

origin, gender, or the presence of any sensory, mental, or physical disability" and the "right to obtain and hold employment without discrimination."

62. Defendant's failure to reasonably accommodate Plaintiff's sincere religious objection to Tyson's Vaccine Mandate, and subsequent adverse employment action against him, is in direct infringement of Plaintiff's rights under Arkansas state law.

63. Plaintiff holds sincere religious beliefs that preclude him from receiving a COVID-19 vaccine. While there may be some who consider COVID-19 vaccines to be acceptable, no employer in Arkansas, public or private, is permitted to decide for itself whose religious beliefs are valid, and whose are not.

64. Defendant's COVID-19 vaccine mandate, which threatens termination for non-compliant employees, discriminates against employees who do not wish to receive the vaccine on religious grounds.

65. Plaintiff sought an exemption from Tyson's Vaccine Mandate based on his sincere religious beliefs.

66. Defendant denied Plaintiffs' exemption request – and instead him no alternative other than to go on one year of unpaid leave under Tyson's LOA+.

67. As such, Defendant failed to provide any reasonable accommodation, but rather implemented a punitive measure against Plaintiff for choosing to exercise his religious beliefs, in violation of Plaintiff's right to obtain and hold employment without discrimination.

### THIRD CAUSE OF ACTION
### [Violation of Arkansas Act 1113]

68. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

69. On October 13, 2021, Act 1113 became law and directly addressed vaccine mandates in the employment setting. In passing that law, the Arkansas Legislature found that "[v]accination mandates are an overreach of authority" and "Arkansas employees need to be protected from this type of overreach," and that ""[t]he General Assembly intends for this act to [p]rotect employees in Arkansas from impending termination due to vaccination mandates." Arkansas Act 1113, 93rd Gen. Assembly, Reg. Sess., 2021, Section 1(a)(2), (4).

70. This law, which went into effect in January 2022, requires that an employer that mandates vaccination or immunization for COVID-19 must "provide a specific exemption process," in addition to any available religious or medical exemption processes, that allows an employee to show either a weekly negative test result or proof of natural immunity twice a year. *Id.* at § 11-5-118(a)-(b).

71. By imposing its Vaccine Mandate, Tyson failed to offer this option to Plaintiff and refused to recognize proof of natural immunity from COVID-19.

72. In doing so, Defendant violated Arkansas Act 1113, which was enacted to prevent such discrimination against employees from such tyrannical medical mandates.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. Enjoin Defendant from taking adverse employment action against Plaintiff;

B. Compensatory damages to the extent allowable under Federal and Arkansas law;

C. An order that Defendant pay Plaintiff's costs and reasonable attorneys' fees; and

D. For such other and further relief as the Court deems appropriate and in the public interest.

DATED: October 11, 2024				Respectfully submitted,

/s/ Lexis Anderson
Lexis Anderson
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: lexisanderson@barneslawllp.com
*Pro hac vice* application pending

*/s/ William Ables*
William Ables Attorney at Law, LLC
111 Center St # 1200,
Little Rock, AR 72201
Telephone: (501) 372-1722
Email: wlables.law@gmail.com

Attorneys for Plaintiff TRAVIS ELLIS